**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                                    )
Todd M. Ladson,                              )
                                                    )
      Plaintiff,                         )
                                                    )
        v.                               )        Civil No. 14-cv-001586 (APM)
                                                    )
The George Washington University,   )
                                                    )
      Defendant.                       )
_____ )

## MEMORANDUM OPINION

### I.     INTRODUCTION

Plaintiff Todd M. Ladson filed this lawsuit against his former employer, Defendant The George Washington University ("GW" or "the University"), alleging that he was terminated from his position as a campus police officer due to: (1) race discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981, and the D.C. Human Rights Act; and (2) age discrimination in violation of the Age Discrimination in Employment Act and the D.C. Human Rights Act. This lawsuit stems from a complaint made in March 2013, when Plaintiff, a 24-veteran of the GW campus police, was accused by a fellow officer of making inappropriate comments about her sexual preference and activities. The University initiated a months-long investigation into the complaint, which uncovered more evidence of inappropriate comments by Plaintiff. Defendant ultimately determined that Plaintiff's behavior violated the University's policy against sexual harassment and created a hostile work environment for his colleagues. In September 2013, Plaintiff was terminated from his position.

Plaintiff views these events differently. He denies making the comments in question and argues that, even if he did, they were not harassing and discriminatory, but rather were innocent

and misinterpreted.  He further argues that the University's investigation was unfair and one-sided.

Finally, Plaintiff contends that the University terminated him due to his race and age while it failed

to punish other instances of similar, or more egregious, conduct by white officers and younger

officers.

The court now considers Defendant's Motion for Summary Judgment.  Having reviewed

the parties' briefing and the evidence, the court finds that no reasonable jury could conclude that

George Washington University discriminated against Plaintiff based on his race or his age when it

terminated him.  The court therefore grants Defendant's Motion for Summary Judgment.

## II.   BACKGROUND

### A.   Factual Background

#### 1.   The Complaint Against Officer Ladson

Plaintiff Todd Ladson began working at The George Washington University ("GW" or

"the University") in 1989.  Pl.'s Opp'n to Def.'s Mot. for Summ. J., ECF No. 15 [hereinafter Pl.'s

Opp'n], at 8.  By 2013, Plaintiff was serving a supervisory role as a Master Patrol Officer in GW's

police force.  Def.'s Mot. for Summ. J., ECF No. 14 [hereinafter Def.'s Mot.], Def.'s Stmt. of

Material Facts, ECF No. 14-2 [hereinafter Def.'s Stmt.], ¶ 1; Pl.'s Opp'n, Stmt. of Material Facts

in Dispute, ECF No. 15-1 [hereinafter Pl.'s Stmt.], ¶ 1.   In March 2013, one of Plaintiff's

colleagues, GW police officer Tiffany Justice, complained to the University that Plaintiff had made

inappropriate comments about her sexual preference and activities.  Def.'s Mot, Ex. 1, March 27,

2013, Email from Tiffany Justice to Tara Pereira, ECF No. 14-3 [hereinafter Justice Email].

Specifically, Officer Justice alleged that Plaintiff had made three inappropriate remarks, namely:

(1) he made comments to Officer Linda Queen regarding her (Queen's) sexuality and suggesting

that she was sexually involved with Officer Justice; (2) he suggested to another officer that Officer

Justice was "one of you," thereby implying that Officer Justice was a lesbian; and (3) he warned a new officer that she will "have men and women after her."  Justice Email at 1; Def.'s Stmt. ¶ 2; Pl.'s Stmt. ¶ 2.

GW prohibits sexual harassment by its employees.  Def.'s Stmt. ¶¶ 3-4; Pl.'s Stmt. ¶¶ 3-4; *see also* Def.'s Mot., Ex. 2, Interim Sexual Harassment and Sexual Violence Policy and Procedures, ECF No. 14-4.[1]  Pursuant to its policy, upon receiving Officer Justice's complaint against Plaintiff, GW began an investigation into Plaintiff's comments.  Def.'s Stmt. ¶ 9; Pl.'s Stmt. ¶ 9.  Plaintiff was suspended with pay on April 2, 2013, "pending an investigation regarding recent allegations that you have been improperly making unwanted comments of a sexual nature about a co-worker and her private life."  Def.'s Mot., Ex. 7, Letter to Officer Ladson from Chief Kevin Hay, April 2, 2013, ECF No. 14-9.

### 2.    *The Investigation by GW Into Officer Ladson's Comments*

Tara Pereira, GW's then-Assistant Title IX Coordinator and Director of Campus Inclusion Initiatives, received the initial complaint from Officer Justice and conducted the investigation into Plaintiff's alleged comments.  Def.'s Mot., Ex. 10, Email from Tara Pereira to Officer Ladson, April 3, 2013, ECF No. 14-12.  As part of her investigation, Ms. Pereira interviewed approximately 13 people and met with Plaintiff multiple times.  Def.'s Stmt. ¶¶ 13-14; Pl.'s Stmt. ¶¶ 13-14. Through her efforts, Ms. Pereira learned—among other things—that Plaintiff had made "lots of racist and sexually graphic" comments; that he had new officer trainees "bark like a dog" as they crawled through a small tunnel; and that he had taught an officer how to smoke marijuana without being caught.  Officer Justice, in particular, told Ms. Pereira that Plaintiff's comments "impacted

---

[1] Plaintiff was well-aware of his employer's policy prohibiting sexual harassment and had attended a training on preventing harassment as recently as March 2013.  Def.'s Stmt. ¶¶ 5-8; Pl.'s Stmt. ¶ 5-8; Def.'s Mot., Ex. 6, Preventing Harassment Certificate of Completion, ECF No. 14-8.

her safety, her environment, her work performance, and the culture of [Plaintiff's] shifts." Def.'s Mot., Ex. 9, Dep. of Tara Pereira, ECF No. 14-11 [hereinafter Pereira Dep.], at 61-75. Officer Justice further reported that Plaintiff's comments "mak[e] it hard to come to work," and that Plaintiff had once asked her "[w]hy are you staring at me? Do I owe you child support?" Def.'s Mot., Ex 12, Pereira Investigation Notes, ECF No. 14-14.

When Plaintiff and his union representative met with Ms. Pereira as part of the investigation, he denied making these comments and suggested that the witnesses who had come forward were lying because they were jealous of him for "making the most overtime" and being "very popular" and a "happy-go-lucky person." Def.'s Mot., Ex. 3, Dep. of Todd Ladson, ECF No. 14-5 [hereinafter Ladson Dep.], at 85-86. However, Plaintiff was unable to point to any evidence to corroborate his claim that the officers who had testified against him were jealous of him, *id*. at 86, or that his accusers had lied during the investigation, *id*. at 95.

At the conclusion of her investigation, Ms. Pereira found that Plaintiff's conduct was "long-standing" and "pervasive" and had impacted numerous officers. Def.'s Stmt. ¶ 33; Pl.'s Stmt. ¶ 22; Pereira Dep. at 100. After the investigation, Plaintiff and his union representative met with Ms. Pereira and Kevin Hay, Chief of the GW Police Department. Def.'s Stmt ¶ 34; Pl.'s Stmt. ¶ 22. The parties were unable to reach a resolution and so, pursuant to University policy, Chief Hay requested that a formal hearing be held. Def.'s Mot., Ex. 15, Memorandum Requesting Formal Hearing Regarding Allegations Against Officer Ladson, ECF No. 14-17, at 1-2.

On August 1, 2013, the University convened a Special Panel[2] to hear the complaint filed against Plaintiff alleging sexual harassment and conduct that created a hostile work environment.

---

[2] The members of the Special Panel were: (1) Christopher A. Bracey (Chair), Senior Associate Dean for Academic Affairs, and Professor of Law, GW Law School; (2) Kimberly D. Acquaviva, Director of Faculty Development, and Associate Professor of Nursing, GW School of Nursing; (3) Eric Annis, Production Manager, Lisner Auditorium; (4)

Def.'s Mot., Ex. 11, Special Panel Report Regarding Complaint Against Officer Todd Ladson,

August 14, 2013, ECF No. 14-13 [hereinafter Special Panel Report], at 1.  At the hearing, Chief

Hay and Plaintiff made opening statements.  *Id*. at 3.  Chief Hay then presented five witnesses,

including Officer Justice and Ms. Pereira.  *Id*.  Those witnesses "testified as to remarks and

comments made by Officer Ladson regarding their sexuality or the sexuality of others."  *Id*. at 6.

The Special Panel heard numerous examples of inappropriate comments made by Plaintiff and

their effect on his coworkers, including:

- Officer Justice testified that Plaintiff had told the parents of another officer that their daughter was in a relationship with Officer Justice;

- Security Officer Octavia Livingston testified that Plaintiff had told her that he did not approve of homosexuals and tried "to convince her that she should be with men";

- Former Police Officer Suzanne Combs testified that she had heard Plaintiff make negative comments following her marriage to her female partner in 2011;

- Security Officer Livingston testified that Plaintiff had made graphic comments while interrogating her about her sexual behavior.  She further testified that she had "submit[ted] herself" to Plaintiff's treatment and did not file a formal complaint because Plaintiff's recommendation was critical to her own status as an officer in the GW Police Department;

- Officer Queen testified that Plaintiff had inquired whether she and Officer Justice "were fucking" and recalled being told that Plaintiff described her as "crazy as shit" and that she "fucks with girls when she wants to";

- Three witnesses testified that Plaintiff's conduct made it more difficult for lesbian officers to work among and be accepted by their fellow officers, and mentioned specific ways in which that "chilling effect" changed their feelings or behavior; and

- Witnesses testified that they "dreaded their training period" with Plaintiff and at least two witnesses testified that they had requested not to be assigned to serve with Plaintiff.

*Id*. at 6-7.

---

Huda M. Ayas, Executive Director, International Medical Programs; (5) Moira E. Secrest, Business Manager, National Health Policy Forum; and (6) Joyce M. Whitmore, Serials Acquisitions Manager, Gelman Library.

When it was his turn to present evidence, Plaintiff "did not . . . present any witnesses, testimony, or evidence." *Id.* at 3. According to the Special Panel Report, Plaintiff was "given multiple opportunities" to offer witnesses, testimony, or evidence to show that the statements heard by the panel were false, but declined to do so, instead offering only a "blanket denial of all allegations" in his opening and closing statements. *Id.* at 7. Plaintiff admits that he "presented no evidence that any of the testimony [heard by the panel] was false." Pl.'s Stmt. ¶ 31. He complains, however, that his counsel who was present at the hearing "was not allowed to speak or utter a work [sic] and/or interrupt the proceedings." Pl.'s Opp'n at 13.

Following the hearing, the Special Panel found that there was "ample evidence" to support Officer Justice's original allegations, along with additional evidence of inappropriate comments made by Plaintiff. *Id.* at 4, 6. Those allegations led the Special Panel to conclude that "Officer Ladson's conduct created a hostile work environment." *Id.* Rather than recommend a punishment, the Report deferred to the GW Police Department to determine how best to sanction Plaintiff. *Id.* at 7. The Report urged the GW Police Department to consider, among other things, "[t]he duration of Officer Ladson's service at the University and, in particular, his long record of relatively distinguished service" and that this was the first complaint alleging harassment brought against him. *Id.*

On September 4, 2013, Chief Hay sent Plaintiff a letter terminating his employment. Def.'s Stmt. ¶ 48; Pl.'s Stmt. ¶ 35; *see also* Def.'s Mot., Ex. 17, Notice of Termination of Employment, ECF No. 14-15, at 1. Chief Hay explained during his deposition that he had determined that Plaintiff should be fired due to the "[t]otality of circumstances based on the finding of the investigation conducted by Tara Pereira," "[t]he egregiousness of the testimony given at the hearing, the fact that there was multiple victims involved, and the fact that he was essentially in a

6

supervisory role as a field training officer, and as a master patrol officer." Def.'s Mot., Ex. 24, Dep. of Kevin Hay, ECF No. 14-26 [hereinafter Hay Dep.], at 21.

### B.    Procedural History

On August 14, 2014, Plaintiff filed a Complaint in the Superior Court for the District of Columbia. *See Ladson v. George Washington University*, Case No. 2014 CA 005029 B. Defendant removed the case to this court on September 18, 2014. *See* Notice of Removal, ECF No. 1. On September 25, 2015, after discovery concluded, Defendant filed a Motion for Summary Judgment arguing that Plaintiff was not discriminated against on the basis of his race or his age, but rather that he was terminated from his employment for a legitimate, non-discriminatory reason, namely, multiple instances of sexual harassment in violation of University policy. *See generally* Def.'s Mot. On October 23, 2015, Plaintiff filed his Opposition to Defendant's Motion for Summary Judgment, contending that his termination constituted discrimination on the basis of his race and age. *See generally* Pl.'s Opp'n. On November 6, 2015, Defendant filed a Reply to Plaintiff's Opposition. *See generally* Def.'s Reply to Pl.'s Opp'n, ECF No. 16 [hereinafter Def.'s Reply].

## III.   LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that a court should grant summary judgment if "there is no genuine issue as to any material fact and [ ] the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. Pro. 56(a)). A material fact is one that is capable of affecting the outcome of litigation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, [ ] on which that party will bear the burden of proof at

trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion" and identifying those portions of the record that it believes "demonstrate the absence of a genuine issue of material fact." *Id.* at 323.

Once the moving party has made an adequate showing that a fact cannot be disputed, the burden shifts to the party opposing summary judgment to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (citation and internal quotation marks omitted) (footnote omitted). The nonmoving party may oppose the motion using "any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves, and it is from this list that one would normally expect the nonmoving party to make the showing to which [the Court has] referred." *Celotex Corp.*, 477 U.S. at 324. "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255 (citations omitted). However, "to defeat a motion for summary judgment, the non-moving party must offer more than mere unsupported allegations or denials." *Dormu v. District of Columbia*, 795 F. Supp. 2d 7, 17 (D.D.C. 2011) (citing *Celotex*, 477 U.S. at 324). In other words, if the non-movant's evidence is "merely colorable" or "not significantly probative," summary judgment may be granted. *Anderson*, 477 U.S. at 249-50. Summary judgment, then, is appropriate when the non-moving party fails to offer "evidence on which the jury could reasonably find for the [non-movant]." *Id.* at 252.

## IV.  DISCUSSION

The court first considers whether a reasonable jury could conclude that Plaintiff's termination constituted illegal discrimination based on race. The court then turns to Plaintiff's claim that he was terminated due to his age.

8

A.      **Plaintiff's Race Discrimination Claim**

Plaintiff claims that Defendant's decision to terminate him constituted unlawful race discrimination in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-2(a); 42 U.S.C. § 1981; and the District of Columbia Human Rights Act, D.C. Code § 2-1401.01 *et seq*.  The legal standards applicable to his claims are the same:   All three "require proof of intentional discrimination, which may be shown by direct or indirect evidence."  *Lemmons v. Georgetown Univ. Hosp.,* 431 F. Supp. 2d 76, 86 (D.D.C. 2006) (citations omitted).  "Where, as here, the plaintiff has proffered no direct evidence of intentional discrimination, race discrimination claims under both the DCHRA and Section 1981 are evaluated using the same framework as claims arising under Title VII of the Civil Rights Act of 1964."  *Id*. (citations omitted).  Thus, the court analyzes all three race discrimination claims under the framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Weber v. Battista*, 494 F.3d 179, 182 (D.C. Cir. 2007).

A Title VII plaintiff bears '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated" against him.  *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981).  To proceed under the *McDonnell Douglas* standard, a plaintiff "must carry the initial burden under the statute of establishing a prima facie case of [race, sex, age] discrimination."  *Bennett v. Solis*, 729 F. Supp.2d 54, 59 (D.D.C. 2010) (citing *McDonnell Douglas*, 411 U.S. at 802).  However, in cases where the employer has asserted a legitimate, non-discriminatory reason for the decision, "the district court need not—*and should not*—decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*."  *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008).  Instead, the court "must resolve one central question:  Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the

employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin?"  *Id*. (citations omitted).

In this case, Defendant has asserted a legitimate, non-discriminatory reason for terminating Plaintiff—namely, that he violated the University's policy on sexual harassment.  Thus, the court turns to the central issue:  whether Plaintiff has produced evidence sufficient for a reasonable jury to find that the employer's stated reason was not the actual reason and that instead it intentionally discriminated against him based on his race.  *See id*. at 495.  Plaintiff asserts three arguments to suggest that GW's stated reason for firing him was pretext for racial discrimination:  (1) that GW terminated Plaintiff based on "subjective" criteria; (2) that the investigation into Plaintiff's comments was "one-sided"; and (3) that Defendant punished white officers less harshly for similar conduct.  *See generally* Pl.'s Opp'n.  The court considers each argument in turn.

### 1.    *Whether Plaintiff was Fired Based on Subjective Criteria*

Plaintiff argues that the allegations of sexual harassment brought against him were "vague, ambiguous, subjective and open to any thousands of possibilities and interpretations," suggesting that the stated reason for his termination was pretext for a more nefarious purpose.  To support this allegation, Plaintiff points to the three incidents that Officer Justice included in her initial complaint and implies that all three could have been interpreted in a non-sexual, non-offensive way.  Pl.'s Opp'n at 2.  Plaintiff also points to the testimony of Suzanne Combs, a fellow GW police officer, who testified that Plaintiff had not made any comments to her about her own sexual orientation, but that she had heard from her colleagues that Plaintiff was homophobic and that "his aura and his energy" suggested that he held antipathy for gays.  Pl.'s Opp'n at 3; *see also* Pl.'s Opp'n., Ex. 4, Dep. of Suzanne Combs, ECF No. 15-4 [hereinafter Combs Dep.], at 13, 28, 38.  According to Plaintiff, whether his alleged comments to Officer Justice and others were offensive

and harassing is an entirely subjective assessment.  What might be offensive and harassing to one person, he seems to argue, might be viewed as in perfectly good fun to someone else.  From that questionable premise, he contends that his termination—based on a subjective evaluation of his behavior—is inherently "suspect."  Pl.'s Mot. at 15.

Plaintiff is correct that "courts traditionally treat explanations that rely heavily on subjective considerations with caution."  *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1298 (D.C. Cir. 1998).  To that end, courts should view with caution explanations for employment decisions based on language such as "dedicated," "enthusiasm," "interpersonal skills," and "being upbeat."  *See Bennett*, 729 F. Supp. 2d at 66.  But the court in *Aka* also explained that "employers may of course take subjective considerations into account in their employment decisions."  *Id.*  If an employer uses subjective criteria to make an employment decision but has "other, well-founded reasons" for the decision, summary judgment for the defendant may be appropriate.  *Id.* Furthermore, employers often have to make employment decisions "based on credibility assessments, circumstantial evidence, and incomplete information."  *Brady*, 520 F.3d at 496.

If GW had fired Plaintiff based solely on Officer Combs' view that Plaintiff had an "aura" and an "energy" that suggested he disapproved of homosexuals, Plaintiff might have reason to complain.  But Defendant's consideration of Plaintiff's well-documented boorish and crude behavior is not the kind of "subjective consideration" that is cautioned against by the court in *Aka*. The uncontested evidence shows that, following a wide-ranging investigation, Plaintiff was fired because he was found to have repeatedly made offensive and inappropriate sexual comments to multiple colleagues, while occupying a supervisory role.  Hay Dep. at 21.  Officer Justice originally complained about three statements concerning her sexuality, which made her "feel disrespected, uncomfortable, and uneasy and has created a hostile work environment for me."  Justice Email

at 1.  But those comments were only the tip of the iceberg.  The subsequent investigation uncovered numerous similar comments made to multiple GW officers, including Plaintiff telling a coworker he did not approve of "homosexuals"; trying to convince a coworker "that she should be with men – that 'this is what G-O-D intended'"; using crude and inappropriate language; and asking if female coworkers were involved sexually.   Special Panel Report at 6.   The University's Title IX investigator described Plaintiff's conduct as "one of the most significant sexual harassment cases" that she has seen.  Pereira Dep. at 77, 100.  The Special Panel confirmed the investigator's findings. Special Panel Report at 5-6.

There is nothing "subjective"—in the *Aka* sense—about the foregoing evidence, and thus there is nothing about GW's reliance on such evidence that would give rise to an inference of discriminatory intent.  Indeed, Plaintiff admitted as much when he conceded that if, in fact, he had said the things that Officer Justice and others accused him of saying, that he should have been fired.  *See* Ladson Dep. at 89-90 ("Q:  You agree that if you said these things that you're accused of, you should very [sic] fired, right?  A:  Yes, sir.").

### 2.       Whether GW's Investigation was Unfair

Next, Plaintiff contends that GW's investigation was "botched and one-sided" because GW "intentionally ignored non-collaborating evidence from other witnesses and also refused to interview Ladson's witnesses."  Pl.'s Opp'n at 16.  Plaintiff also contends that his counsel was not allowed to question witnesses at the Special Panel hearing and was "instructed not to say a word." *Id*. at 3, n. 16.

It is true that an "employer's investigation that is so unsystematic and incomplete that a factfinder could conclude that the employer sought, not to discover the truth, but to cover up its own discrimination can also permit a factfinder to find pretext."  *Burley v. Nat'l Passenger Rail*

*Corp.*, 801 F.3d 290, 296 (D.C. Cir. 2015).  But here, Plaintiff does not in any meaningful way identify how the investigation against him was deficient, let alone "so unsystematic and incomplete" as would enable a trier of fact to infer pretext.

Plaintiff asserts that Ms. Pereira failed to interview witnesses that would have been favorable to him, *see* Pl.'s Opp'n at 11, but he does not identify any such witness by name or what such a witness would have said, *see id.* at 11, 16.  Moreover, Plaintiff argues that Ms. Pereira ignored evidence from officers who had worked with Plaintiff but had never heard him utter any harassing comments.  *See id.* at 12.  However, this argument is difficult to understand, as Plaintiff does not explain whether Ms. Pereira simply refused to interview such witnesses or whether she buried favorable evidence after interviewing them.  Nor does he explain how such evidence would have either negated the specific accusations against him or bolstered his denials.  *See id.*  In any event, even if Plaintiff had identified shortcomings in the investigation, he cannot argue that he was prevented from calling favorable witnesses before the Special Panel.  After all, he elected to call no witnesses.  *See* Special Panel Report at 3, 7 (stating that Plaintiff declined the opportunity to present witnesses, testimony, or evidence at the hearing).

Plaintiff's assertion that the Special Panel was a "kangaroo court" because his counsel was unable to speak on his behalf is equally without merit.  Pl.'s Opp'n at 3 n.16.  Whatever one thinks of university procedures that minimize the role of the accused's counsel or advisor at a hearing— and there are critics of such policies[3]—Plaintiff has not pointed to any deviation from Defendant's

---

[3] *See, e.g.,* Emily D. Safko, *Are Campus Sexual Assault Tribunals Fair?: The Need for Judicial Review and Additional Due Process Protections in Light of New Case Law*, 84 Fordham L. Rev. 2289, 2330 (2016) ("Congress should enact legislation that requires schools to allow students representation during disciplinary proceedings. In the due process and Title IX contexts, courts generally have not recognized an absolute right to attorney representation for students at school disciplinary proceedings."); Robert B. Groholski, *The Right to Representation by Counsel in University Disciplinary Proceedings: A Denial of Due Process of Law*, 19 N. Ill. U. L. Rev. 739, 800 (1999) ("Given the importance of the interest at stake and the existence of procedural safeguards which would reduce any burden placed on a university, the right to representation by retained counsel should be required as an element of due process in university disciplinary proceedings.").

established policies in this case that would give rise to an inference of pretext.  *See* Def.'s Mot.,

Ex. 2, The George Washington University Interim Sexual Harassment and Sexual Violence Policy

and Procedures, ECF No. 14-4, at GWU 01019 (providing that "[n]o advisor, including an attorney

who may be acting as an advisor, may speak on behalf of the party, make an opening or closing

statement, present testimony or examine witnesses").

>    3.    *Whether GW Selectively Enforced its Sexual Harassment Policy Based on Race*

Lastly, Plaintiff argues that Defendant's decision to terminate him was inconsistent with—

and more harsh than—the University's treatment of white officers who have engaged in similar

conduct.  Pl.'s Opp'n at 4.  He points to three current or former GW campus police officers who,

according to Plaintiff, made comparable comments or committed comparable acts but were treated

with more leniency by the University:  George Brittle, Reed Jones, and Christopher Brown.  *Id.* at

5.  Plaintiff argues that, due to the similarities in their employment statuses and because they too

were subject to GW's sexual harassment policy, the only explanation for why the three officers

were "treated better for doing and saying much worse" than Plaintiff is because they are white.  *Id.*

at 17-18.  If true, Plaintiff avers that such evidence suggests that the stated reason for Plaintiff's

termination was pretext for racial discrimination.  *Id.*  The court first describes the evidence

concerning these comparators, and then analyzes whether that evidence aids Plaintiff.

>    a.    The comparators

>    i.    *George Brittle*

Plaintiff claims that George Brittle, a white officer, referred to another officer by her badge

number, "69," which refers to a sexual position, and "made frequent sexual comments about gay

men." Compl., ECF No. 1, ¶¶ 27-28.  Plaintiff further contends that Officer Brittle received five-day suspensions for those transgressions but was never terminated.  *Id.*

Evidence shows that in 1991, Officer Brittle admitted saying to a female officer that she "still use[s] the [locker] number 69."  Def.'s Mot., Ex  18, Memorandum Regarding Verbal Counseling – Corporal George Brittle, ECF No. 14-20 [hereinafter Brittle Verbal Counseling Letter].  Officer Brittle apologized for the remark and was "counseled and warned" by his supervisor, Captain Anthony RoccoGrande, not to make jokes or engage in sexual innuendo about his colleagues.

Officer Brittle was involved in another incident in 2008, where he "made comments perceived as homophobic and racially insensitive that belittled and embarrassed [his] subordinates."  Def.'s Mot., Ex. 19, Letter of Warning to Lieutenant George Brittle, ECF No. 14-21 [hereinafter Brittle Letter of Warning].  The Letter of Warning also referenced a third incident in 2007 when Brittle "made a sexually coercive remark that embarrassed" his subordinate and "created a situation of professional embarrassment" for the subordinate, for Brittle, and for the GW Police Department. *Id.* Brittle's supervisor at the time, Executive Assistant Chief Isom, expressed disappointment and "great concern" over his behavior and required that Brittle (1) apologize to his shift; (2) take a University class in diversity; and (3) take a departmental class on working in a diverse environment.  *Id.*

### ii.    *Reed Jones*

Plaintiff next alleges that Officer Reed Jones, a 26-year old white officer, frequently used a racial slur to refer to African-American officers, for which he was suspended but not terminated. Compl. ¶ 29.  In 2012, the GW Police Department received an anonymous complaint alleging that Officer Jones had used racial slurs in reference to people of color.  Def.'s Mot., Ex 25, Memo.

From Frank Demes Regarding Compl. Against Officer Reed Jones, ECF No. 14-27 [hereinafter Jones Memo].   In response to that complaint, GW began an investigation into Officer Jones' conduct that involved more than 42 interviews.   *Id.*   Of all the individuals interviewed, one remembered hearing Officer Jones use the actual term "racial slur" but no one recalled him actually uttering a racial slur.   *Id.*   The investigation determined that the complaint was "unfounded and completely without merit."   *Id.*

### iii.   Christopher Brown

Finally, Plaintiff contends that Officer Christopher Brown sexually harassed fellow officer Linda Queen when he asked her out on a date but was not fired for his conduct.   Ladson Dep. at 165.   Plaintiff admits that he is unaware of any other allegations against Officer Brown.   *Id*. at 166.   An investigation by Ms. Pereira concluded that Officer Brown did, in fact, ask Officer Queen and other officers to have breakfast with him in an attempt "to get to know his staff."   Pereira Dep. at 25.

### b.   Analysis of comparator evidence

"One way to discredit an employer's justification is to show that similarly situated employees of a different race received more favorable treatment."   *Royall v. Nat'l Ass'n of Letter Carriers, AFL–CIO*, 548 F.3d 137, 145 (D.C. Cir. 2008). "For a plaintiff to prove that she is similarly situated to another employee, she must demonstrate that she and the alleged similarly-situated employee 'were charged with offenses of comparable seriousness,' and 'that all of the relevant aspects of her employment situation were nearly identical to those of the other employee.'"   *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1115-16 (D.C. Cir. 2016) (quoting *Burley*, 801 F.3d at 301 (alteration omitted)). "Factors that bear on whether someone is an appropriate comparator include the similarity of the plaintiff's and the putative comparator's

job and job duties, whether they were disciplined by the same supervisor, and, in cases involving discipline, the similarity of their offenses." *Id.* at 1116 (quoting *Burley*, 801 F.3d at 301) (internal quotation marks omitted).

Applying these principles, not one of the three GW campus police officers identified by Plaintiff is a valid comparator.  Beginning with former Officer Brittle, he cannot be considered a comparator to Plaintiff because he was not supervised by Chief Hay.  *See Wheeler*, 812 F.3d at 1116 (citing as a factor "whether [the plaintiff and putative comparator] were disciplined by the same supervisor").  Plaintiff seems to admit as much.  Pl.'s Opp'n at 6 ("even if we were to exclude Brittle out of the comparator calculus because he was not supervised by Chief Kevin Hay…").

With respect to Officer Jones, the GW Police Department conducted an investigation into an anonymous complaint that he made racial slurs about people of color and, after more than 42 interviews, concluded only that Officer Jones used the term "racial slur," but did not actually use any racial slurs.  Jones Memo at 1.  The unsubstantiated allegation against Officer Jones in no way compare to the ultimately proven, repeated instances of sexual harassment committed by Plaintiff.  *See Wheeler*, 812 F.3d at 1116 (citing as a factor "the similarity of [the plaintiff's and comparator's] offenses").

Plaintiff fares no better with Officer Brown.  He contends that Brown sexually harassed his coworker Officer Queen when he "tr[ied] to date" her.  Ladson Dep. at 165.  Plaintiff offers no other evidence that Brown violated GW's policy against sexual harassment.   Ms. Pereira investigated Brown's alleged conduct, but concluded that Brown had asked Officer Queen and other officers to have breakfast with him in an attempt to get to know his staff.  Pereira Dep. at 25-26.  But even if Officer Brown had asked Officer Queen out on a date, and thereby violated University policy, the seriousness of that behavior pales in comparison to that of Plaintiff.  He was

found to have asked Officer Queen—the very same officer who Brown allegedly asked out on a date—if she and Officer Justice "were fucking" and told another officer that Officer Queen "was crazy as shit" and "fucks with girls when she wants to."  Special Panel Report at 6.  Any suggestion of comparability between Plaintiff and Officer Brown is wildly off the mark.

In sum, none of the officers Plaintiff cites are valid comparators.  As a result, Defendant's treatment of Plaintiff in comparison to its treatment of those officers is not evidence of pretext. More generally, Plaintiff has not offered a shred of evidence that would allow a reasonable jury to conclude that he was terminated because of racial discrimination, rather than due to the numerous acts of sexual harassment that his employer found him to have committed.  For the reasons stated above, the court grants summary judgment in favor of Defendant as to Plaintiff's race discrimination claims.

### B.    Plaintiff's Age Discrimination Claim

Plaintiff also alleges that his termination was based on improper age discrimination under the Age Discrimination in Employment Act, *see id.* ¶¶ 69-78, and under the DCHRA, *see* Compl. ¶¶ 44-52.  But Plaintiff does not address his age discrimination claims in his summary judgment opposition; in fact, those claims are not even mentioned.  As a result, the court will treat Defendant's motion as to Plaintiff's claims of age discrimination as conceded.  *See Wilkins v. Jackson*, 750 F. Supp. 2d 160, 162 (D.D.C. 2010) ("It is well established that if a plaintiff fails to respond to an argument raised in a motion for summary judgment, it is proper to treat that argument as conceded."); *Sykes v. Dudas*, 573 F. Supp. 2d 191, 202 (D.D.C. 2008) ("[W]hen a party responds to some but not all arguments raised on a Motion for Summary Judgment, a court may fairly view the unacknowledged arguments as conceded.").

Moreover, even if Plaintiff has not conceded the claim, Defendant has put forth a legitimate non-discriminatory reason for terminating Plaintiff—his violation of the University's sexual harassment policy—and Plaintiff has not responded with any evidence whatsoever that suggests that that reason was pretext for an age-based motive. *See Chappell-Johnson v. Powell*, 440 F.3d 484, 487 (D.C. Cir. 2006) ("The *McDonnell Douglas* framework applies to both Title VII and ADEA claims.") (citation omitted). Plaintiff had the burden to show that age was the "but-for" cause of his termination. *Bennett*, 729 F.Supp.2d at 59-60 (citing *Gross v. FBL Fin. Servs., Inc.,* 557 U.S. 167, 180 (2009)). He has offered no evidence that would allow him to meet his burden.

## V.     CONCLUSION

For the foregoing reasons, the court grants Defendant's Motion for Summary Judgment. A separate order accompanies this Memorandum Opinion.

Dated:  September 1, 2016                                   Amit P. Mehta
                                                            United States District Judge